Filed 7/28/22 In re the Domestic Partnership of von Dorrer-Hildebrand and Veccia CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Domestic Partnership of CHRISTINA VON DORRER-HILDEBRAND and ELLEN M. VECCIA. | H045095 (Santa Clara County Super. Ct. No. 2012-1-FL-162814) |
| CHRISTINA VON DORRER-HILDEBRAND, Appellant, v. ELLEN M. VECCIA, Respondent. | |

Appellant Christina von Dorrer-Hildebrand (Christina) and respondent Ellen M. Veccia (Ellen) share joint legal and physical custody of two children through a stipulated judgment. Christina appeals the trial court's order giving Ellen final decision-making authority over whether to vaccinate either or both children. (Order)

On appeal, Christina contends the trial court erred by modifying legal custody without requiring Ellen to show a significant change in circumstances before granting her request. She further argues Ellen failed to show the modification was in the children's best interests. Finally, she claims the trial court erroneously denied her request for a long-cause hearing to present expert medical testimony on the issue of whether immunization was appropriate for the children. For the reasons set forth below, we

conclude Christina has not established prejudicial error occurred. We therefore affirm the Order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Christina and Ellen, who entered into a domestic partnership in 2005, have two children, I. (born 2005) and O. (born 2008). In 2013, the couple sought to dissolve the partnership. They entered into a Domestic Partnership Settlement Agreement (DPSA), and the trial court entered a stipulated judgment dissolving the partnership and incorporating the DPSA. Pursuant to the DPSA, Christina and Ellen agreed to share joint legal and physical custody of the children. The DPSA expressly provides that Christina and Ellen would share access to information about the health of the children and would have joint control over, and cooperate regarding, the children's healthcare provider and medical care.

When the children were born, Christina and Ellen agreed they would not vaccinate them. When the couple first enrolled the children in preschool, they chose to file personal belief exemptions that permitted the children to attend school without the immunizations otherwise required by law at that time.[1] The children remained unimmunized until the couple separated. After the separation, however, Ellen asked that the children be vaccinated against tetanus. Then, during the measles epidemic in 2015, Ellen decided she wanted the children to receive every vaccine for which they were eligible.

After the 2015 measles outbreak, California passed Senate Bill No. 277. (Health & Saf. Code, § 120325 et seq.) This bill eliminated the personal belief exemption that Christina and Ellen had relied on, and mandated that children be immunized to attend

___

[1] Because the trial court's order only addressed the question of vaccinating the children, we limit our discussion of the facts to that issue.

school in California, unless the child had a medical exemption.[2]  As a result, the children's pediatrician, Dr. Vukicevic, stopped seeing patients who were not fully vaccinated, causing the children to lose access to their doctor.

By this time, I. was preparing to enter seventh grade in middle school and O. was entering the fourth grade at the private school both children had been attending.  I. either needed to be vaccinated or needed a medical exemption to enroll, so Ellen sought to revisit the vaccination issue.[3]  Ellen expressed concern that the children remained unvaccinated, putting them at risk for "unnecessary diseases," including measles.  Christina continued to object to vaccinating the children despite the change in the law and the children's exclusion from their pediatrician's practice.

Without consulting with Ellen, Christina worked with a medical researcher in Israel, Yehuda Shoenfeld, to genetically test the children using a home administered test.  Christina hoped the genetic testing would determine whether the children had any of the genetic mutations that Dr. Shoenfeld was working on related to vaccines.  With the results of the test and several articles, Christina first sought a medical exemption for the children from Dr. Vukicevic.  The pediatrician referred the results to the genetics

---

[2] Under Health and Safety Code section 120335, subdivision (b), the governing authority of a public or private elementary or secondary school cannot unconditionally admit any person as a pupil, unless he or she has been fully immunized prior to his or her first admission.  Where a pupil, prior to January 1, 2016, had on file a letter or affidavit stating beliefs opposed to immunization, he or she can remain enrolled without immunization until enrollment in the "next grade span"; the specified grade spans are "[b]irth to preschool," kindergarten through grade 6, and "[g]rades 7 to 12, inclusive." (Health & Saf. Code, § 120335, subd. (g)(1) & (2).)  Health and Safety Code section 120370 sets forth the conditions for obtaining a medical exemption from the immunization requirements.  Senate Bill No. 277 modified provisions of the Health and Safety Code to eliminate the personal belief exemption from the then-existing immunization requirements, and modified the procedure for obtaining a medical exemption, among other things.  (Sen. Bill No. 277 (2015-2016 Reg. Sess.) §§ 1, 2, 5.)

[3] O. was allowed to remain in school based on the personal belief exemption until she entered the "next grade span."  (Health & Saf. Code, § 120335, subd. (g)(1) & (2).)

3

department at Stanford University Medical Center, which opined that there was no basis to believe vaccines would cause the children any medical problems. Christina rejected these conclusions because she did not believe either Dr. Vukicevic or Stanford were "up-to-date on the latest research" regarding vaccinations. Based on her own medical research, she did not agree with any physician who recommended vaccinations, except the experts with whom she had consulted.

When Dr. Vukicevic refused to provide a medical exemption, Christina, without Ellen's knowledge or consent, obtained medical exemptions for both children from a doctor who had neither examined the children nor treated them, doctor John Hicks, M.D. In his brief exemption letters, Dr. Hicks stated that the children have a family history of and genetic predisposition for autoimmune disease. He concluded that the state of their immune systems was such that any vaccination could trigger the start of autoimmune disease, and he recommended that neither child receive vaccines. The letters did not set forth the basis for any of these conclusions, nor did the letters state that he had examined either child or reviewed any of their medical history. Christina then submitted the medical exemptions to the children's school, again without Ellen's knowledge or consent.

After Ellen discovered the actions Christina had taken, and the two remained at an impasse despite private mediation, Ellen sought an order modifying legal custody to grant her medical decision-making power, including the "ability to vaccinate the children." Ellen asked that the court allow her "the exclusive ability to follow the course of treatment recommended by the children's doctors without Christina having the ability to block or delay [Ellen's] decisions." Ellen represented that she would "agree to keep Christina informed, post hoc, of every appointment and every procedure," and to "consider [Christina's] position regarding any necessary vaccinations or procedures. . . ." Ellen stated she would rely on their pediatricians' recommendations for the treatment of the children, rather than "try to backdoor the issue," by going to a doctor and/or obtaining treatment that was not agreed upon by the parties, as Christina had done.

4

Christina opposed Ellen's request, arguing that Ellen was seeking to modify legal custody, and thus needed to show a significant change of circumstances, but had not done so. Christina acknowledged her opposition to vaccinating the children but argued that it was well founded based on her own research and on the recommendation of Dr. Hicks, who agreed that the children should not be vaccinated because of the risk of provoking an auto-immune disease. She asked the court to hold a "long-cause" hearing so she could present the testimony of expert medical witnesses, as well as "her own expertise" regarding the risks associated with vaccinating the children. She did not provide a list of proposed witnesses or identify any expert witnesses.

The court denied Christina's request to present expert testimony. The court stated that it would not be deciding whether to vaccinate the children; rather, it would decide which parent would have the authority to make that decision if the parents could not reach an agreement. The court confirmed it "full[y] inten[ded] to retain a joint legal and joint physical custody as between the parties." The parties would have a "continuing obligation . . . to meaningfully meet and confer over medical decisions involving the minor children . . . ." The court stated it would only decide who would be the "tie breaker" in the event the parents reached an impasse.

The court held a hearing where Ellen and Christina presented evidence. Ellen testified, through an offer of proof by her attorney, that the declaration she submitted in support of her request for orders was true and correct. Christina testified through an offer of proof and on the witness stand regarding her position on vaccinating the children. The court examined her regarding her purported expertise on the subject of vaccination.

After ordering the parties to meet and confer about a process going forward, the trial court issued its final order. The court found that Christina had "subverted the letter and spirit of the parties' DPSA and the grant of joint legal custody" by obtaining genetic testing of the children, by using the genetic tests to obtain a medical exemption for the children from a physician of "unknown credentials who neither examined the children

5

nor reviewed their medical histories," and by submitting the medical exemptions to the children's school without Ellen's knowledge or consent.

In addition, the court found that Christina demonstrated "inflexibility on the issue of decision-making regarding the children's medical care" by "categorically dismissing" Dr. Vukicevic and any other medical providers who disagreed with the vaccination position espoused by Dr. Shoenfeld, by stating her intention to reject any future medical opinion in favor of vaccinations unless provided by Dr. Shoenfeld, Dr. Hicks, or someone whose opinion was comparable to those two doctors,[4] and by justifying her unwillingness to consider Dr. Vukicevic's opinions and Ellen's position on the grounds that she is a medical and market researcher with experience based on "self-directed lay reading of medical literature . . . ."

The trial court further found Ellen had "demonstrated her willingness to co-parent, not least by accommodating for several years [Christina's] steadfast opposition to vaccination until the measles outbreak[,] Dr. Vukicevic's termination of her clinical relationship with the children, [I.'s] scheduled matriculation into middle school and the failure of private mediation brought the parties' disagreement to a head. The court rejects as unsubstantiated [Christina's] assertion that [Ellen] has made an issue of vaccination in bad faith."

Based on these findings, the court denied Ellen's request for sole decision-making authority over *all* medical issues but granted her final decision-making authority over whether to vaccinate the children, and the scope and timing of such vaccinations "if vaccination is appropriate." The court directed the parties to jointly consult with Dr. Vukicevic regarding the propriety of vaccinating the children if she was willing to continue treating the children. The court also made specific orders about how the parties would choose a new medical provider if Dr. Vukicevic was unavailable to treat the

---

[4] The court noted Dr. Shoenfeld does not practice in the United States and Dr. Hicks had been deceased since 2016.

children.  The court ordered that "the parties shall jointly consult the selected pediatrician regarding the genetic issues raised by [Christina]" and the "propriety of vaccination of the parties' children under Health & Safety Code sections 120325 et. seq."

Christina timely appealed the Order.[5]

## II. DISCUSSION

### A. *Any Failure to Require a Showing of Changed Circumstances is Harmless*

Christina contends that granting Ellen final decision-making authority over whether to vaccinate the children modified legal custody, and therefore the court erred in granting the request without requiring that Ellen show a significant change in circumstances.  We conclude that even if granting Ellen final decision-making authority over immunizations could be construed as a modification in legal custody, any failure to require an express showing of changed circumstances was harmless.

There is no dispute that the trial court did not require Ellen to show a change of circumstances.  Despite Christina's objection, the court held that no such showing was needed because it expressly rejected the notion that it was modifying legal custody, and stated that it fully intended to retain joint legal custody.  We are not bound by the trial court's characterization however.  The question of whether the change amounted to a modification in legal custody is a question of law, which we review de novo.  (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1378 (*Enrique M.*).)

Under the terms of the DPSA, Christina and Ellen share joint legal custody, which means that both parents share the rights and the responsibilities of making decisions relating to the child's health, education, and welfare.  (Fam. Code, § 3003.)[6]  Conversely,

---

[5] The trial court stayed enforcement of the order until October 12, 2017.  Prior to the expiration of the stay, Christina petitioned this court for a writ of supersedeas staying enforcement of the trial court's order during the pendency of the appeal; we denied her petition.

[6] Undesignated statutory references are to the Family Code unless otherwise indicated.

7

sole legal custody grants those rights and responsibilities to only one parent. (§ 3006.) Although a trial court has continuing jurisdiction to modify custody orders throughout a child's minority whenever it is in the best interest of the child (§§ 3022, 3087, 3088), a parent who seeks to modify a final custody order must demonstrate " 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest. [Citation.]" (*In re Marriage of Brown and Yana* (2006) 37 Cal.4th 947, 956 (*Brown & Yana*), citing *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256 (*Montenegro*) and *Burchard v. Garay* (1986) 42 Cal.3d 531, 535.) The policy considerations underlying this requirement—continuity and stability—are well settled.[7] (*Brown & Yana*, at p. 956.)

Not every request to revise a final custody order requires a showing of significant changed circumstances. A parent who seeks a modification that is not tantamount to changing joint custody to sole custody, or vice versa, need not demonstrate a significant change of circumstances. (*Enrique M.*, *supra*, 121 Cal.App.4th at pp. 1379-1381 [change in visitation schedule and school "did not amount" to a request to modify joint custody]; *In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508, 1512-1513 [alteration of parenting schedule did not constitute modification of physical custody requiring material changed circumstances].) Thus, the appellate court in *In re Marriage of Furie* (2017) 16 Cal.App.5th 816 (*Furie*), upheld a trial court order granting mother's request for "sole authority" over the children's orthodontic care, despite a stipulated judgment awarding the parents joint legal custody. In *Furie*, mother alleged father refused to coparent on orthodontic issues and the trial court granted mother sole decision-making authority without requiring a showing of changed circumstances. (*Furie,* at pp. 820, 822.) There the court found that the change allowing mother sole decision-making authority over orthodontic issues amounted to something less than a change of legal custody. The court

_____

[7] The parties do not dispute that the DPSA was a final order under *Montenegro*, *supra*, 26 Cal.4th at pages 258-259.

8

held that on those facts, a showing of changed circumstances was not required. (*Id.* at p. 827.)

Ellen contends, as in *Furie*, the change allowing her sole decision-making authority over immunization issues amounts to something "less than a change of legal custody." (*Furie, supra,* 16 Cal.App.5th at p. 827.) Christina responds that the "legal basis for the *Furie* court's holding is mistaken," because it rests on appellate decisions that address changes in physical, rather than legal, custody. She also argues that these cases were wrongly decided.[8] Under the circumstances here, however, we need not decide whether the court in *Furie* was correct in concluding that some changes in decision making authority are so minor that they do not change the legal custody originally established. Nor do we need to decide whether granting Ellen final decision-making authority over immunizations, while expressly directing the parties to jointly consult with Dr. Vukicevic, and setting up a cooperative process for selecting a new provider if Dr. Vukicevic was unwilling to continue treating the children, was a minor enough change that it did not change legal custody, as in *Furie*.

Even if, despite the express continued obligation to cooperate, the order granting Ellen final tie-breaker decision making authority was tantamount to a change in legal custody, any failure by the trial court to require a showing of changed circumstances was harmless. (See *Darab Cody N. v. Olivera* (2019) 31 Cal.App.5th 1134, 1145.) There were in fact material changes in circumstances since the parties signed the DPSA that were detrimental to the children. (*Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 996 (*Ragghanti*).) New legislation after the 2015 measles outbreak codified California public policy requiring vaccinations for school age children but eliminated the personal belief

---

[8] Although we are not bound by decisions of other appellate courts, we ordinarily follow them out of respect for stare decisis, absent good reason to disagree. (*People v. The North River Ins. Co.* (2019) 41 Cal.App.5th 443, 454-455.) These cases have been applied in the family divisions of California's superior courts for over three decades. We find no good reason to revisit their holdings.

exemption the couple had relied on to enroll the children in school. Christina's continued objection to vaccinating the children jeopardized the children's continued enrollment in school. Additionally, the children's pediatrician terminated their care because they were not vaccinated, and the children were without a pediatrician. These changes occurring since Christina and Ellen signed the DPSA were " 'of a kind to render it essential or expedient for the welfare of the child that there be a change.' [Citation.]" (*Ibid.*) Intervention was needed to ensure that the children could remain enrolled in school and had access to medical care.

The court considered these recent developments and changes in the law with great particularity in reaching its conclusions. Just because the court did not believe it was modifying legal custody, and therefore did not frame its consideration in terms of "changed circumstances," does not mean that Christina suffered any prejudice from this failure. Because we are not bound by the trial court's characterization, because there were substantial changes in circumstances necessitating a change for the benefit of the children, and because the court did actually consider evidence of these changed circumstances, any failure by the trial court to characterize its analysis in terms of "change in circumstances" was harmless. (*Ragghanti*, *supra*, 123 Cal.App.4th at p. 996.)

### B. The Trial Court Did Not Err in Denying a Hearing to Receive Live Medical Testimony

Christina next contends that the trial court erred in denying her request for a "long-cause hearing." She contends that pursuant to section 217 the court was required to hold a hearing so that she could present expert medical testimony supporting her objections to vaccinating the children.[9] Citing Evidence Code sections 210 and 351, she argues that

---

[9] Section 217 requires the court hold a hearing to "receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties." (§ 217, subd. (a).) There is no reference to the type of hearing the court is supposed to hold. The reference to a "long-cause" hearing originates in the Santa Clara County Superior Court Local Family Rules, rule 5.H., which states in

10

the opinions she intended to offer were relevant to the issues raised by Ellen's request and admissible, and, thus, should have been allowed.[10]

"We review a trial court's evidentiary rulings for abuse of discretion. [Citation.] This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.] There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. [Citation.] A trial court will abuse its discretion by action that is arbitrary or 'that transgresses the confines of the applicable principles of law.' [Citations.] In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion. [Citations.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

In her request, Ellen sought, among other things, that the court grant her exclusive medical decision-making authority for the children and order that the children be vaccinated without delay. Christina requested a hearing because she felt "the issues raised in Ellen's motion . . . require expert medical opinions be provided to the Court and direct testimony by medical professionals well versed on . . . vaccination." In denying her request to present medical expert testimony, the court stated that it would not be deciding whether to vaccinate the children, so expert testimony would be collateral. Christina argues that the trial court erred.

relevant part, "A 'long cause' hearing is any hearing other than a trial that will take longer than 30 minutes." (Super. Ct. Santa Clara County, Local Family Rules, rule 5.H.)

[10] Evidence Code section 210 states, " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence Code section 351 states, "Except as otherwise provided by statute, all relevant evidence is admissible."

Pursuant to section 217, "[a]t a hearing on any order to show cause or notice of motion brought pursuant to [the Family Code], absent a stipulation of the parties or a finding of good cause pursuant to subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing." (§ 217, subd. (a); accord Cal. Rules of Court, rule 5.113(a).) The court "may make a finding of good cause to refuse to receive live testimony and shall state its reasons for the finding on the record or in writing." (§ 217, subd. (b).)

We first note that the court did hold a hearing where Christina testified both about her objections to vaccinating the children and about her research regarding vaccines. At the hearing, the court itself questioned Christina about her asserted expertise. Christina testified that, "I have had -- I've done medical research with various professionals, both doctors and Ph.D.'s, too, and -- and studied -- I've read probably thousands of medical research journals and I analyzed them and gone through them. And I've conferred with many experts as well . . . . [B]y profession I'm a market researcher. I have a degree in math and psychology. I don't have a degree in market research yet I've got 20 years experience and the top Silicon Valley companies hire me to do market research for them. So, in the same way that I have experience in that I have experience in medical research. And it's mostly secondary research in the sense that I'm reading research and analyzing it and doing various things with it thereafter." The court also asked Christina if she had training in medicine, biology, physiology, or immunology. Christina conceded that she did not have training in these fields. Although the court declined to receive additional evidence from unidentified experts Christina believed she could produce, the court did allow Christina to testify on the subject at the hearing.

Christina's contention that she was entitled to an additional hearing involving medical experts fails. First, the evidence she sought to introduce was not relevant to the issue before the court. Christina contends that the medical testimony was relevant, but she incorrectly identifies the question before the trial court. The question was not

12

whether it was or was not preferable to vaccinate the children. The court expressly limited the issue it would decide to, "whether to modify the existing orders to allocate final decision[-]making authority between the parents . . . . And it would be arrogant of me to pretend to dictate to the parents what course of medical treatment would be appropriate for the minor child." To decide this issue, the court evaluated which parent was more likely to facilitate cooperative parenting in the course of the decision-making process, while including the other parent in the process and minimizing conflict between the parents. Medical testimony supporting Christina's position that vaccines posed a risk to the children was not relevant to this question. The trial court stated that it would not evaluate the merits of Christina's belief that the children should not be immunized, because it would provide a mechanism for the parents to work with medical experts to make that decision. In granting Ellen final decision-making authority, the court was swayed by Christina's actions that violated the DPSA—testing the children, obtaining medical exemptions, and submitting them to the children's schools without Ellen's knowledge and consent—not by the sincerity of Christina's beliefs regarding vaccines. Neither the basis for, nor the merits of, her beliefs about vaccines was relevant to the issue the trial court decided.

Second, even if Christina could show relevance, the court had good cause to deny the hearing. In evaluating whether good cause exists to refuse live testimony, the court, in addition to the rules of evidence, must consider, among other factors, whether material facts are in controversy, whether live testimony is necessary for the court to assess the credibility of the parties or other witnesses, and the right of the parties to question anyone submitting reports or other information to the court. (Cal. Rules of Court, rule 5.113(b).) There were no material facts in controversy that the medical testimony could have resolved because the court was not deciding whether the children would be vaccinated, nor was it considering or evaluating the desirability or risks of vaccines. The only facts at issue concerned Christina's actions that the trial court found violated the DPSA. Since

13

Christina admitted testing the children, obtaining the medical exemptions, and submitting them to the school, those facts were not in dispute. Any proffered medical testimony, therefore, would not have helped to inform the court on any factual issue before it.

Similarly, since the court was not evaluating the merits of the proffered medical opinions of Dr. Hicks and Dr. Shoenfeld, and Christina did not identify any other experts, the court had no need to assess their credibility or to rely on their expertise. (Evid. Code, § 801, subd. (a).) Even if the vaccination issue had been before the court, it is not clear whether the proffered expert testimony would have been admissible, since achieving full vaccination is already the stated public policy in California, and neither doctor had personally examined or treated the children, or even reviewed their medical history.[11] However, since the court expressly did not decide whether the children should be vaccinated, we need not reach this issue here.

Nor was the right of the parties to question those submitting reports to the court implicated in this instance. Here, Christina claims she wanted to present live testimony in support of her own documentary evidence and testimony. However, she did not submit a witness list with her responsive papers or identify any other expert witnesses, prior to or during the hearing as required by section 217, subdivision (c). (Cal. Rules of Court, rule 5.113(e).) Since Dr. Hicks was deceased and Dr. Shoenfeld lives in Israel, and no other experts were identified below, Christina was not denied the right to present live expert testimony.

Further, section 217 is principally intended to allow a party an opportunity to confront witnesses and rebut evidence introduced by the opposing party, not to bolster their own documentary evidence. (See *In re Marriage of Deamon* (2019) 35 Cal.App.5th

---

[11] Health and Safety Code section 120325 sets forth the intent of the Legislature to provide, "[a] means for the eventual achievement of total immunization of appropriate age groups against [an enumerated list of] childhood diseases. . . ." (Health & Saf. Code, § 120325, subds. (a) & (c).)

14

476, 482.) Here, there is no indication that Ellen asked to challenge Christina's medical evidence or cross-examine Christina's witnesses, and Ellen was provided an opportunity to cross-examine Christina herself. Since Christina did not provide a witness list and the court ruled that it would not be deciding whether the children should be vaccinated, Ellen had no reason to make that request. Absent a request by Ellen for an opportunity to question Christina's experts and given the lack of relevance to the question before the court, no party's right to question a declarant was infringed. The court had good cause to deny the request.

Finally, Christina claims that allowing expert testimony regarding the risks of vaccinations would have likely "rehabilitated" her in the court's eyes, revealing that she was not acting out of "uninformed stubbornness." She also suggests the court would have made a different decision had it received the expert testimony. But even had the court received additional information about the potential risks associated with vaccinating the children, such testimony would not have altered the trial court's finding that Christina violated the spirit of the DPSA by obtaining genetic testing and a medical exemption for the children without Ellen's knowledge or consent. The court based its decision to give Ellen final decision-making authority on its finding, supported by substantial evidence, that Ellen would consider Christina's opinions and cooperate with her in determining whether the children should be vaccinated. The court did not abuse its discretion when it ruled that it did not need expert testimony to make this decision.

### C. The Trial Court Did Not Err in Granting Ellen Decision-Making Authority.

Whether or not the trial court's order was a modification of legal custody, the trial court did not err in ordering the change. Any modification in parental authority requires a showing that the change is in the best interests of the child. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) We review the trial court's modification order for abuse of discretion. (See *Montenegro*, *supra*, 26 Cal.4th at p. 255.) Here, the trial court did not abuse its discretion because substantial evidence supports the order.

15

At the time of this proceeding, to determine the best interest of the child, the court was required to consider, in relevant part, the health, safety, and welfare of the child, and the nature and amount of contact with both parents."[12] (§ 3011; Stats. 2012, ch. 258 (A.B. 2365), § 1.) In setting up a process by which the parents could agree on a medical care provider moving forward and by granting Ellen tie-breaker authority, the court determined that this change would benefit the children's health, safety, and welfare. The court expressed concern that the elimination of the personal belief exemptions jeopardized the children's continued enrollment in school, and their expulsion from their pediatrician's practice left them without access to medical care. The court considered Christina's inflexibility on the issue of decision-making regarding the children's medical care, and her dismissal of any medical opinion that did not align with her views on immunization, as well as Ellen's demonstrated history of cooperative parenting and openness to a broad range of medical opinions. This evidence supported the court's conclusion that the ordered changes would be in the children's best interest because the impasse that had developed between their parents on the critical subjects of school enrollment and medical care would be resolved.

Christina contends there is no nexus between the trial court's findings and the children's best interests, because the court did not focus on the propriety of vaccinations, but instead considered the inability of the parties to reach agreement regarding whether to vaccinate the children. As discussed above, the parent's inability to agree regarding immunization was impacting the children's access to medical care and jeopardizing their schooling.

The way in which each parent chose to address this dispute was also directly relevant to the children's best interests. The DPSA was designed to protect the children's

---

[12] Nothing in the record suggests the other factors set forth in section 3011 at the time of trial—a history of abuse by one parent against specified persons, or a history of drug use or alcohol abuse by either parent—were relevant in this case.

16

health, safety, and welfare by requiring that the parents mutually schedule the children's medical appointments and seek written consent from the other parent to engage any new healthcare provider. In violation of that agreement, Christina obtained a medical exemption for I., and then submitted it to the school, without Ellen's knowledge or consent. Christina's decision to retain a healthcare provider, found by the trial court to be "of unknown credentials" who never saw the children and yet issued an exemption for them also was not in the children's best interests.

As important, Christina's lack of transparency put the children in the middle of parental conflict, which the trial court could properly consider in assessing the children's best interest. Her insistence that the children not be vaccinated resulted in the termination of the children's clinical relationship with the pediatrician who had treated them since birth. Christina's decision to administer genetic testing by taking buccal swabs from the children, who were certainly old enough to understand why they were being required by their mother to submit the samples, also highlighted for the children the growing conflict between the parents. In its findings, the trial court provided a record that Christina's unwillingness to cooperate with Ellen and the ensuing impasse between the parents was detrimental to the health and welfare of the children. The trial court did not abuse its discretion when it addressed the ongoing conflict by authorizing Ellen, having found her to be the more cooperative parent, to make the final decision regarding whether to immunize the children if she and Christina reached an impasse after consulting with medical professionals.

### III. DISPOSITION

The August 14, 2017 Order After Hearing is affirmed.

17

_____

Greenwood, P.J.


WE CONCUR:




_____

Grover, J.






_____

Danner, J.




Von Dorrer-Hildebrand  v. Veccia
No. H045095